### J. L. SHELL v. THE STATE.

#### No. 6821.  Decided April 26, 1922.

1.—Murder—Confession—Question and Answers—Bill of Exceptions.

The mere fact that a confession is made in reply to questions does not vitiate it; besides, that objection does not apply to the confession in the instant case.  It relates the circumstances leading up to the killing and incident thereto, and appears to the court to be the statement of defendant telling in his own way the facts as best he could, and there being nothing to indicate that the confession was not voluntary, there was no error in admitting it in evidence; besides, the bill of exceptions is insufficient.

2.—Same—Declarations and Acts of Defendant—Letter—Evidence.  ·

Upon trial of murder, the son of the defendant testified that within a few minutes after the killing he talked to his father, who told him what the devil could do for people, etc., and that the deceased had made threats against him and handed to the witness one sheet of a letter she had written to her husband, in which she stated that defendant was trying to lead her a dog's life, whereupon the defendant offered other parts of the purported letter, to which objection was made by the State, because the same had not been identified, etc., there was no error in introducing the first part of the letter and rejecting the other portion.  Distinguishing Corpus v. State, 51 Texas Crim. Rep., 315.

3.—Same—Mental Incapacity—Motion for New Trial—Newly Discovered Evidence.

Upon motion for new trial setting up that defendant was of unsound mind and irresponsible for his acts, it did not appear from the bill of ex-

ceptions any statement of fact of the testimony upon the issue, same could not be considered on appeal.

Appeal from the District Court of Sabine.   Tried below before the Honorable V. H. Stark.

Appeal from a conviction of murder; penalty, death.

The opinion states the case.

*W. R. Hyden,* for appellant.

*R. G. Storey,* Assistant Attorney General, for the State.

HAWKINS, Judge.—Appellant is under conviction for the murder of his step-daughter, the jury having assessed his penalty at death.

The facts reveal that deceased was a young woman about twenty-three or twenty-four years of age whose mother appellant had married at a time when deceased was quite a small child. · As she grew into young womanhood, and about seven or eight years before the killing, appellant seems to have become infatuated with her, or at lease possessed of an unholy desire to have improper relation with her, and had continually importuned her to this effect.  She had persistently refused his advances and finally married one Simmons.  Appellant encouraged this marriage with the idea that if married she would then consent to his (appellant's) sexual embraces.  He was disappointed in this expectation.  After deceased and her husband lived together for a time they separated and deceased came back to the home of appellant and her mother to live.  His advances were renewed and met with the same rebuff as formerly.  The killing occurred about daylight.  On the day and night preceding he had again made improper proposals to deceased, and had been told by her that she intended to leave the house.  She had written a letter to her husband in which she stated that she was going to leave home the next day, and that her father "was leading her a dog's life."  Appellant saw her writing and the first two pages of the letter (being that part containing the expression above referred to) was taken by appellant from the suit case of deceased.  On the morning of the killing about daylight appellant went to the bed where deceased was sleeping with her mother and with a razor cut her throat from ear to ear, severing the jugular vein. He then attempted to take his own life by cutting his own throat with the same instrument.  It is not necessary to set out in detail the evidence.  Many of the facts related appear from appellant's confession introduced against him.  The details are harrowing and disclose one of those unfortunate and inexplainable conditions which sometimes arise.

Appellant complains in his bill of exception No. 2 because the

court admitted a confession made by him, urging as his objections that the same was in question and answer form, and showed upon its face that it was not a voluntary statement of confession as contemplated by the law. The bill does not set out the confession, and we might dismiss the subject upon the insufficiency of the bill, but because the extreme penalty of the law was inflicted we have gone to the statement of facts and examined the confession as it there appears. It consists of four entire pages, single spaced, typewritten matter. In the confession are some question, but only where it was apparently necessary for the attorney taking the same to make the interrogation in order to make plain to whom appellant was referring, or to clear up some involved statement. The mere fact that a confession is made in reply to questions does not vitiate it. Section 67, page 42, Branch's Ann. P. C. But that objection does not apply to the confession in the instant case. It relates the circumstances leading up to the killing and incident thereto, and appears to us to be the statement of appellant telling in his own way the facts as best he could. There is nothing to indicate that the confession was not voluntary. Instead of being subject to the criticism directed at it we desire to commend it as being nearly in line with what we conceive a confession ought to be than those we generally are called upon to review. It is apparent from its face that the district attorney (Mr. K. W. Stephenson) was not in the least undertaking to impose upon or take an unfair advantage of appellant. The confession, instead of being couched in the verbiage of the taker as is too frequently the case, shows that the language is that of appellant himself, even as to grammatical construction and disconnected and confused statements.

Appellant's son, a young man about eighteen years of age, testified that the killing occurred about daylight; that the confusion following awakened him, and that within a few minutes after the killing he talked to his father who was telling him (witness) what the devil could do for people, and to always fear the devil and women, and that appellant told him (witness) "she was going to have me killed, and here is a letter," and handed to witness one sheet of a letter. This was identified by the witness and offered in evidence by the State. It was a sheet of letter paper written on both sides, the page being numbered one and two, and was as follows:

"Mr. W. F. Simmons:

Dear Darling :-

"I will rite you a few lines to let you know — yet living but that is all I don't think will live long I dont think you are doing me rite Sweetheart you wont send me *in* of cothes Sweetheart how can you have the hart to keep ever thing pore little girl hais got well darling you don know what a time that I am having darling I havnt got now home or master poir little girl havnt got now none to cair

inthing for me I am going to leve to mair in may to go am on the mersy of the world papa is tring to lead me a dog life. I can stay at home in more So I gess I will go to the dogs right But I am going to hold on long as I can The way look dime somtime and pore little girl—."

The confession of appellant discloses that after he made an improper advance to deceased upon the day before the killing she wrote a letter; that later on he searched through her suit case and got that portion of the letter which he afterwards turned over to his son. In his confession he refers to that statement in the letter where the deceased said, "Papa is trying to lead me a dog life." After the kiling witness searched the suit case and found what is contended by appellant to be the other portion of the letter, consisting of pages three, four, five, six, seven and eight. Appellant offered in evidence that portion of the letter found in deceased's suit case, and which is as follows:

"Wont send me my cloth that I work so hard for purr little girl sweetheart cant you have the hart to love me that much wine I aint able to work for in mor you said that you wold help me as long as I wont mairy but darling you told me that you wood send me my trunk and you dident say in thing about it and havint never have said in thing about them a told darling I gess you have got your cair and having a good time but sweetheart I am having a hard time I cry all the time it is all I can do to ceep from killing myself some time you have done me so bad and I sure have done you baid but darling I am weping yet to and yet sure does hurt me but darling am going hold may carterck to as long as I can Pa is going to put me to picking cotton and gess I will die but no won wood cair if in thing they wood be gld of it sweetheart if you will send me may things get that old man that come an got them and I will pay him may self if I can bair the muney until I can work it out and I will be glad of it if U will send them I am going to take them whar I work at pure little girl haf to leave home and hant got nou wone to cair in thing for pure little of in firl may God and may Lord win yay time come to die darling I have rote and rote and got three letters from you and non of them said that you wood bee her the first of August and won was that you got hurt and if you ar going to let me have may things let me know and if you not I am going after them and see you if you are thir I will see you to darling I haint afraid of in thing I dont cair for in thing I had rather be did and living in how I am com after them for you know that they are mine and know won wont to see sweetheart you will se me some wone look baid I am poir than I ever wase bee and gess hell is my dum but if it is your will you will know who sent me to hell O may God if you dont see me in mor for God sakes dont do the next woman like you did me and I am crying and

ring my poir little hands for the way that I did you darling but I know we wood not get alog in mor thay wood be in use in tring for you said that you dident want me with arece mine this is my last letter that hant use I will send you a kiss for it may be the last."

Objection by the State to this portion of the letter was sustained. The objections are not set out in the bill, but the trial judge qualified it by stating, in substance, that there was no testimony offered showing that pages, three, four, five, six, seven and eight were a part of the same letter as pages one and two offered by the State; that the testimony failed to establish in the mind of the court that the pages offered by appellant were written by deceased, and also failed to show that appellant had ever had pages three, four, five, six, seven and eight in his possession or had ever seen them or had any knowledge of their existence; further the court concluded that the contents thereof would likely inflame the minds of the jurors against appellant. We assume that appellant was seeking to introduce the portion of the letter found in the suit case under the provisions of Article 811, C. C. P., which reads:

"When a part of an act, declaration or conversation or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other, as, when a letter is read, all other letters on the same subject between the same parties may be given. And when a detailed act, declaration, conversation or writing is given in evidence, any other act, declaration or writing which is necessary to make it fully understood or to explain the same may also be given in evidence."

The evidence was uncertain and unsatisfactory as to whether that portion of the letter found in the suit case was in the handwriting of deceased, but we are inclined to the view that taking the pages so found in connection with the ones in possession of appellant they were sufficiently identified as being written by her as not to have been excluded on that ground if they were otherwise admissible. The letter in question was not written to appellant, but was written to deceased's husband from whom she was separated at the time, and therefore does not come within the rule of a correspondence or part of a correspondence between the parties involved. There is no evidence in the record which would lead us to the conclusion that appellant ever saw or read any part of the letter except that portion taken by him out of the suit case and delivered to his son after the killing. The general rule appears to be that where a letter or portion of a written instrument is introduced by one side as original evidence that all of the same on the same subject can be introduced by the other side. 7 Encyclopedia of Evidence, page 92-128; Corpus v. State, 51 Texas Crim. Rep., 315. The general rule is based upon the proposition that the parties themselves are familiar with the writing or correspondence in question and their actions are to be viewed in the light of the en-

tire writing or correspondence and not a part only. The evidence discloses that deceased had communicated to appellant her final determination to leave home and subject herself to no further indecent proposals from him, and that portion of the letter offered in evidence by the State was admissible to show motive and the state of appellant's mind at the time of the killing in view of a confirmation by it of what she had told him. That portion of the letter which he never saw and never had in his possession could no more have affected his action than a conversation which he never heard. If the trial court was in error in not admitting that portion of the letter offered by appellant, then it becomes our duty to consider whether any possible harm could have resulted to appellant from its exclusion. That portion of the letter excluded was an appeal by deceased to her husband to return some of her things which were in his possession, and lamenting that he had not come to see her. It is apparent from its face that it was an effort to get him to take her back. It throws no light upon that portion of the letter offered by the State. As may be seen from an inspection of that part of the letter excluded, it could only have served the purpose of arousing the sympathy of the jury for deceased. It in no way contradicted or lessened the effect of the portion offered by the State. We are constrained to hold that nothing in it could have in any way aided appellant and therefore its exclusion could have done him no possible harm.

In his motion for new trial appellant avers that he was of unsound mind and irresponsible for his acts and statements and was mentally incapable of understanding or comprehending the legal effect of his confession when he made it, and therefore same should not have been admitted. The State joined issue upon the motion. Appellant undertakes to reserve an exception to the action of the court in overruling the same. The trial judge appends to the bill the statement that— "A great deal of evidence was offered by the State and defendant upon the hearing of said motion, and the court after hearing all evidence offered overruled said motion."

There does not appear as a part of the bill any evidence offered upon the hearing of the motion for new trial, and we fail to find in the statement of facts any testimony upon the issue raised by the motion. We are unable to act upon such assignment in the absense of facts before the court at the time he overruled the motion. We must assume that his action was proper and fully authorized.

Finding no error in the record, the judgment of the trial court is affirmed.

*Affirmed.*